1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY R. TURNER,

11           Plaintiff,                No. 2: 10-cv-1848 MCE KJN P

12      vs.

13   WARDEN SALINAS, et al.,

14           Defendants.         FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  Pending before the court are cross-motions for summary judgment

19   filed by plaintiff and defendants Hall and Colon.[1]  After carefully reviewing the record, the

20   undersigned recommends that defendants' motion be granted in part and denied in part, and that

21   plaintiff's motion be denied.

22   ////

23   ////

24   ////

25   _____

26        [1]  The other named defendants have been dismissed.

1

II.  Legal Standard for Summary Judgment

Summary judgment is appropriate when a moving party establishes that the standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any material fact, and that the movant  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that such a

1   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

2   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

3   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

5   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

6   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

7   1436 (9th Cir. 1987).

8           In the endeavor to establish the existence of a factual dispute, the opposing party

9   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

10  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

11  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

12  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

13  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

14  committee's note on 1963 amendments).

15          In resolving a summary judgment motion, the court examines the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

17  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

18  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

19  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

20  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

21  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

22  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

23  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

24  show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

25  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

26  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

III.  Discussion

      A.  Background

On July 25, 2011, plaintiff filed a summary judgment motion regarding his claims against defendant Colon.  (Dkt. No. 69.)  On July 27, 2011, plaintiff filed a summary judgment regarding his claims against defendant Hall.  (Dkt. No. 70.)  On August 25, 2011, defendants filed their summary judgment motion.  (Dkt. No. 71.)  On August 11, 2011, defendants filed oppositions to plaintiff's motions.  (Dkt. Nos. 72, 73.)  On August 18, 2011, plaintiff filed an opposition to defendants' motion.  (Dkt. No. 74.)

On September 2, 2011, defendants filed a reply to plaintiff's opposition.  (Dkt. No. 75.)  Defendants' reply contained new evidence, i.e., the declarations of defendants Hall and Colon.  When new evidence is presented in a reply, the court should not consider the new evidence without giving the non-moving party an opportunity to respond.  Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996).  Accordingly, on September 7, 2011, the undersigned granted plaintiff twenty-one days to file a supplemental opposition.  On September 19, 2011, plaintiff filed a supplemental opposition.  (Dkt. No. 78.)  On September 21, 2011, defendants filed a reply to plaintiff's supplemental opposition.  (Dkt. No. 79.)

      B.  Plaintiff's Claims

This action is proceeding on the amended complaint filed August 24, 2010.

Plaintiff alleges that he was transferred from the Yolo County Jail to the Deuel Vocational Institution ("DVI").  Upon his arrival at DVI, Yolo County sheriffs deputies allegedly told officers at DVI that plaintiff was a "legal beagle" and that they should watch him.

Plaintiff alleges that on May 26, 2010, he was deprived of his right to a daily shower by defendant Hall.  Plaintiff also alleges that continuing after May 5, 2010, defendant Hall withheld plaintiff's legal mail, rerouted his regular mail and prevented plaintiff from receiving mail.  Plaintiff also claims that defendant Hall removed plaintiff's name from the list for law library access.  Plaintiff alleges that defendant Hall took all of the actions described

4

1  above in retaliation for plaintiff being a "legal beagle."

2      Plaintiff alleges that on June 25, 2010, defendant Colon deliberately slammed the

3  steel door of plaintiff's cell on plaintiff, causing pain to plaintiff's shoulder and ankle.

4      Plaintiff seeks compensatory, punitive and nominal damages, declaratory relief

5  and unspecified injunctive relief.

6      C.  Claims Against Defendant Colon

7      *Legal Standard for Eighth Amendment*

8      "[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual

9  punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319 (1986).

10  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes

11  from constitutional recognition de minimis uses of physical force, provided that the use of force

12  is not of a sort repugnant to the conscience of mankind."  Wilkins v. Gaddy, 130 S. Ct. 1175,

13  1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)) (internal quotations omitted).

14      Not "every malevolent touch by a prison guard gives rise to a federal cause of

15  action."  Hudson, 503 U.S. at 9.  As the Supreme Court recently explained in Wilkins:

16      The 'core judicial inquiry' ... [is] not whether a certain quantum of
17      injury was sustained, but rather 'whether force was applied in a
       good-faith effort to maintain or restore discipline, or maliciously
       and sadistically to cause harm.' ... This is not to say that the
18      "absence of serious injury" is irrelevant to the Eighth Amendment
       inquiry. '[T]he extent of injury suffered by an inmate is one factor
19      that may suggest 'whether the use of force could plausibly have
       been thought necessary' in a particular situation.' The extent of
20      injury may also provide some indication of the amount of force
       applied.
21
       . . .
22
       Injury and force, however, are only imperfectly correlated, and it is
23      the latter that ultimately counts. An inmate who is gratuitously
       beaten by guards does not lose his ability to pursue an excessive
24      force claim merely because he has the good fortune to escape
       without serious injury. Accordingly, the Court concluded in
25      Hudson that the supposedly 'minor' nature of the injuries
       'provide[d] no basis for dismissal of [Hudson's] § 1983 claim'
26      because 'the blows directed at Hudson, which caused bruises,

                                    5

1        swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes.' 503 U.S. at 10.

2

3  130 S. Ct. at 1178–1179 (some internal citations omitted).

4        *Analysis*

5        It is undisputed that on June 25, 2010, defendant Colon was operating the controls

6  for plaintiff's cell door.

7        Citing 42 U.S.C. § 1997(e)(e), defendant Colon first moves for summary

8  judgment on grounds that plaintiff suffered no physical injury.  This section provides that, "[n]o

9  federal action may be brought by a prisoner confined in a . . . prison . . ., for mental or emotional

10  injury suffered while in custody without a prior showing of physical injury."

11        The physical injury requirement only applies to claims for mental and emotional

12  injuries and does not bar an action for a violation of a constitutional right.  See Oliver v. Keller,

13  289 F.3d 623, 630 (9th Cir. 2002).

14        Although hardly a model of clarity, Oliver determined that §
15        1997e(e) does not apply to claims for compensatory damages not
          premised on emotional injury, suggesting that the violation of a
16        constitutional right has a compensatory value regardless of what
          the physical/emotional injuries are. Oliver, 289 F.3d at 630. In
17        other words, damages would be available for a violation of
          Cockcroft's Eighth Amendment rights without regard to his ability
18        to show a physical injury. Oliver made this point in holding that " §
          1997e(e) applies only to claims for mental and emotional injury.
19        To the extent that appellant's claims for compensatory, nominal or
          punitive damages are premised on alleged Fourteenth Amendment
20        violations, and not on emotional or mental distress suffered as a
          result of those violations, § 1997e(e) is inapplicable and those
21        claims are not barred." Oliver, 289 F.3d at 630. The fact that
          Cockcroft never suffered any physical injury as a result of Linfor's
22        alleged acts may make his Eighth Amendment claim of very little
          financial value but does not make the claim non-existent.

23  Cockcroft v. Kirkland, 548 F.Supp.2d 767, 776-77 (N.D. Cal. 2008).

24  *////*

25  *////*

26  *////*

1    In this action, plaintiff seeks compensatory damages for the pain he allegedly

2  suffered as a result of defendant Colon allegedly slamming the cell door on his body.  Pursuant to

3  Oliver, as explained by the district court in Cockcroft, plaintiff's Eighth Amendment claim is not

4  barred by 42 U.S.C. § 1997e(e).

5    As noted above, the Supreme Court has found that the absence of injury is

6  relevant in determining the existence of an Eighth Amendment claim.  In the summary judgment

7  motion, the only evidence offered by defendants that plaintiff suffered no physical injuries are

8  entries from plaintiff's medical records from June 22, 2010, and July 13, 2010.  Defendants

9  contend that on both dates, plaintiff complained of injuries to his back, wrist and arm which were

10  caused by a car accident one year earlier.  Defendants argue that on July 13, 2010, plaintiff did

11  not complain of injuries caused by defendant Colon.

12    However, defendants have not demonstrated that these are plaintiff's only medical

13  records from that period of time.  The undersigned cannot find that plaintiff suffered no physical

14  injury based on these selected entries from plaintiff's medical records.

15    In his amended complaint, plaintiff alleges that he suffered  "serious physical

16  injuries of pain . . ."  (Dkt. No. 13 at 17.)  Attached to plaintiff's opposition are several medical

17  records.  (Dkt. No. 74 at 16-33.)  After reviewing these records, the undersigned cannot find any

18  entries concerning injuries suffered by plaintiff as a result of defendant Colon allegedly

19  slamming the cell door on him.  Many of these records are from before June 25, 2010.

20    Although plaintiff offers no medical records in support of his claim that he

21  suffered "serious . . . pain," the undersigned finds that plaintiff's claim of "serious . . . pain" is

22  sufficient to overcome an argument by defendants that plaintiff has not demonstrated an Eighth

23  Amendment violation due to the absence of injury.

24  ////

25  ////

26  ////

7

1    Defendants also argue that defendant Colon is entitled to summary judgment

2  because an investigation into plaintiff's claims found that defendant had not violated any

3  department policies.  In support of this argument, defendants refer to the response to plaintiff's

4  staff complaint against defendant Colon by the Associate Warden.  (Dkt. No. 71-4 at 23-25.)  In

5  this response, a box is checked next to the statement, "The inquiry is complete.  It was

6  determined that staff did not violate CDCR policy with respect to one or more of the issues

7  raised."  (Id. at 24.)   An internal investigation finding that defendant Colon did not violate the

8  policy of the California Department of Corrections and Rehabilitation ("CDCR") does not

9  demonstrate that defendant did not violate plaintiff's Eighth Amendment rights.

10    In the reply, defendants move for summary judgment on grounds that defendant

11  Colon did not act maliciously and sadistically to cause plaintiff harm.  In support of this claim,

12  defendants cite defendant Colon's declaration attached to the reply where he states, in relevant

13  part,

14        2.  For approximately three or four months in 2010, I was assigned
      to the F-wing housing unit at DVI.  During this time, I worked as
15       the housing officer.  The control booth was an elevated space on
      the second tier of the housing unit.  There were three tiers in that
16       housing unit.  Located in the control booth was a panel with
      buttons controlling the cell doors to each cell in the housing unit.
17       For each of the approximately 120 cells, there were two buttons.
      One button would light up red and the other button would light up
18       green.  When the button was lit red, that meant that the door to that
      cell was closed.  When the other button was lit green, that meant
19       that the cell door was open.

20        3.  To open a cell a cell door, the control booth officer could press
      the button that was lit red.  This would unlock the door and it
21       would then slide open.  Once it was fully locked open, the other
      button would then light green.  To then close the door, the control
22       booth officer could press the button that was lit green.  Once it was
      fully locked closed, the other button would then light red.  It would
23       take a door approximately two seconds to open or close fully.

24        4.  The control booth officer had the ability to open and close all
      cell doors in the F-Wing at once or he could open and close
25       individual doors.

26

5.  During the brief time of approximately two seconds when a cell door was opening or closing, neither button on the panel in the control booth would be lit.

6.  The cell doors worked on air pressure.  When released to either be opened or closed, the door would make a slight hissing sound, indicating to the inmates in the cell that the door was about to open or close.  The door would then move fairly slowly.  A door being closed would stop if it struck a person and it was possible for a person to stop a door from closing by grabbing it with his hand.

7.  In addition to the panel in the control booth, cell doors could be opened by correctional staff with a key to the cell.

8.  Throughout my time as an officer in F-Wing, cell 115 had a door that regularly malfunctioned.  Cell 115 was on the first tier. The cause of the malfunction was unknown to me.  The malfunction would result in the door not opening when the red button was pushed and not closing when the green button was pushed.  Frequently, neither button would be lit up for extended periods of time, thus making it impossible for the control booth officer to determine whether the door to cell 115 was open or closed.  Because cell 115 could not be seen from the control booth, it was impossible for the control booth officer to visually see whether the door was open or closed.

9.  There were two methods for dealing with the malfunctioning door on cell 115.  When neither button on the panel was lit up, the control booth officer could alternate between rapidly pressing each button.  This would regularly fix whatever the problem was and cause the door to either open or close, depending on what was desired.  The other method of dealing with the door was to simply have one of the correctional officers on the first tier use a key to open or close cell 115.

10.  On June 25, 2010, I was the housing officer in F-Wing.  Using the panel in the control booth, I pressed the buttons necessary to open the cells in the unit so that the inmates could leave for breakfast.  However, cell 115's buttons did not light up.  I therefore presumed, since neither button had lit, that the door was not open.  At this moment, there were no correctional officers on the first tier to open cell 115 with a key.  I therefore pressed the two buttons on the panel for cell 115 in rapid succession in an attempt to open the cell door.  Neither button lit up and I could not see the cell door.

11.  As I pressed the two buttons for cell 115, I heard one of the inmates in cell 115, Anthony Turner, yell out indicating that the door was open.  I therefore called out to him that I was sorry. A moment later, Turner had exited the cell and come into my view. He was angry and yelling obscenities up at me.  I again apologized.

1
2

> When he continued his verbal abuse, I instructed him to proceed to breakfast. He then walked off to breakfast. Some time later, after breakfast, Turner returned to the housing unit.

3
4
5

> 12. At no time on June 25, 2010, did Turner express to me that he had suffered any injuries as a result of the door on his cell. No injuries were visible to me and I witnessed him walk both to and from breakfast without any difficulty.

6  (Dkt. No. 75-2.)

7       Plaintiff's version of events is discussed in his verified summary judgment

8  motion. Plaintiff states that his cellmate, Anthony Hopkins, had to "intervene" and hold the cell

9  door open from a "second assault" while plaintiff tried to get up off the floor. (Dkt. No. 69 at 3.)

10  Plaintiff claims that when he told defendant that he had slammed the door on his shoulder,

11  defendant Colon responded, "Shut the fuck up and take your ass to chow or you will not eat."

12  (Id. at 3-4.)

13       Plaintiff also states that defendant Colon's acts were "carried out in an oppressive,

14  fraudulent, malicious, vexatious, *deliberate*, cold, callous and *intentional manner* in order to

15  injure and damage plaintiff . . ." (Id., at 5.) In the operative amended complaint, plaintiff alleges

16  that defendant Colon "*knowingly*" slammed the door on plaintiff's right shoulder and ankle.

17  (Dkt. No. 13 at 17.) Based on these statements, the undersigned finds that plaintiff is claiming

18  that defendant Colon could see plaintiff's cell when the door allegedly closed on plaintiff.[2]

19       Whether defendant Colon could see plaintiff's cell at the time of the incident, and

20  thus purposefully "slammed" the cell door on plaintiff, is a disputed material fact. If plaintiff's

21  version of events is true, and defendant Colon was able to see plaintiff's cell, then it may be

22  possible to find that defendant acted maliciously and sadistically when he caused the door to

23  close, at least twice, as plaintiff exited the cell. If defendant's version of events is true, and he

24

25       [2] In his administrative appeals regarding this matter, plaintiff also claimed that defendant
26  Colon "saw him exiting his cell and he pushed the door button repeatedly which 'slammed' the cell door" on plaintiff. (Dkt. No. 69 at 8.)

could not see plaintiff's cell and was only trying to open the door so that plaintiff could get to

breakfast, the undersigned would find that defendant did not act maliciously and sadistically.

Defendants did not provide a diagram demonstrating that plaintiff's cell could not be seen from

the control booth.  Had such a diagram been provided, the court may have been able to resolve

this claim.

Whether the cell door was capable of causing the pain plaintiff alleges he suffered

is also a disputed material fact.  According to defendant, cell doors close "fairly slowly."

Defendant also claims that the cell doors stop if they strike a person and that it is possible for a

person to stop a door from closing by grabbing it with his hand.  According to plaintiff, the

impact from the cell door caused him to fall to the floor and suffer great pain.  This claim

conflicts with defendant Colon's description of how the cell door operates.  In other words, if the

cell door moves "slowly" and stops if it "strikes" a person, it seems unlikely that plaintiff would

have fallen to the floor and suffered "serious . . . pain" when the door began to move when he

was in its path.

Based on these disputed material facts, neither plaintiff nor defendant should be

granted summary judgment as to plaintiff's Eighth Amendment claim.

Defendants also move for summary judgment on the grounds that defendant

Colon is entitled to qualified immunity.  "The doctrine of qualified immunity protects

government officials from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The defendant bears the burden of

establishing qualified immunity.  Crawford-El v. Britton, 523 U.S. 574, 586-87 (1998).

The Supreme Court, in Saucier v. Katz, 533 U.S. 194 (2001), outlined a two-step

approach to qualified immunity.  The first step requires the court to ask whether "[t]aken in the

light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?"  Saucier, 533 U.S. at 201.  If the answer to the first

1  inquiry is yes, the second inquiry is whether the right was clearly established: in other words,

2  "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

3  he confronted." Saucier, 533 U.S. at 201.

4          Taken in the light most favorable to plaintiff, the undersigned finds that defendant

5  Colon's alleged conduct violated plaintiff's constitutional rights.  The undersigned finds that it

6  would be clear to a reasonable officer that intentionally "slamming" a cell door on an inmate was

7  unlawful.   Accordingly, defendant Colon is not entitled to qualified immunity.

8          The undersigned also observes that in his declaration, defendant Colon states that

9  the door to plaintiff's cell regularly malfunctioned.  Defendant also states that after plaintiff

10  yelled that the cell door was open, defendant yelled that he was sorry.  Defendant again

11  apologized when plaintiff came into his view and began yelling at him.  It is unclear if these

12  statements are a concession by defendant that the cell door closed on plaintiff, possibly as a result

13  of the malfunctioning door.  These statements in defendants' declaration suggest that plaintiff's

14  claim may alternatively proceed on an Eighth Amendment theory of unsafe conditions.

15          Prisoners alleging Eighth Amendment violations based on unsafe conditions must

16  demonstrate that prison officials were deliberately indifferent to their health or safety by

17  subjecting them to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 833

18  (1994).  "For a claim . . . based on a failure to prevent harm, the inmate must show that he is

19  incarcerated under conditions posing a substantial risk of serious harm." Id. at 834.  The prisoner

20  must also demonstrate that the defendant had a "sufficiently culpable state of mind." Id.  This

21  standard requires that the official be subjectively aware of the risk; it is not enough that the

22  official objectively should have recognized the danger but failed to do so. Id. at 838.  "[T]he

23  official must both be aware of facts from which the inference could be drawn that a substantial

24  risk of harm exists, and he must also draw the inference." Id. at 837.  "[A]n official's failure to

25  alleviate a significant risk that he should have perceived but did not . . . ." does not rise to the

26  level of constitutionally deficient conduct. Id. at 838.  "[I]t is enough that the official acted or

1   failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842.  If the risk

2   was obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42.

3           "[D]eliberate indifference entails something more than mere negligence ... [but] is

4   satisfied by something less than acts or omissions for the very purpose of causing harm or with

5   knowledge that harm will result." Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005),

6   quoting Farmer, supra, 511 U.S. at 835.  Prison officials display a deliberate indifference to an

7   inmate's well-being when they consciously disregard an excessive risk of harm to that inmate's

8   health or safety.  Farmer, 511 U.S. at 837-838.

9           The undersigned will not address the issue of unsafe conditions because neither

10   party has briefed this issue.[3]

11           D.  Claims Against Defendant Hall

12           *Legal Standards for Retaliation*

13           In Rhodes v. Robinson, 408 F.3d 559 (9th Cir. 2005), the Ninth Circuit set forth

14   the five basic elements of a First Amendment retaliation claim:

15           (1) An assertion that a state actor took some adverse action against
            an inmate (2) because of (3) that prisoner's protected conduct, and
16           that such action (4) chilled the inmate's exercise of his First
            Amendment rights, and (5) the action did not reasonably advance a
17           legitimate correctional goal.

18   408 F.3d at 567-68.

19           *Analysis*

20           Defendants argue that defendant Hall is entitled to summary judgment because

21   there is no evidence that he retaliated against plaintiff.  In the summary judgment motion, the

22   evidence upon which defendants primarily rely in support of this argument is from administrative

23

24           [3]  In his declaration, defendant states that rapidly pushing the red and the green button
        "regularly" fixed the problem and caused the door to plaintiff's cell to open or close.  However, it
25   is unclear from defendant's declaration whether this "solution" always worked, or whether there
        occasions where plaintiff's cell door did not open or close correctly despite rapidly pressing both
26   buttons.

appeals.  For example, defendants cite a First Level Appeal Response by Correctional Sergeant Talisayan which concluded that defendant Hall did not deny plaintiff a shower.  (Dkt. No. 71-4 at 8.)  Correctional Sergeant Talisayan reached this conclusion after reviewing log books.  (Id.)

The "statements" in the administrative appeals by the investigating prison officials are not verified.  In addition, some of the "statements" contain hearsay.  For these reasons, the undersigned cannot consider these appeals in evaluating defendants' summary judgment motion.

Attached to defendants' reply is the declaration of defendant Hall.  In this declaration, defendant Hall addresses plaintiff's allegations of retaliation:

> 2.  In May 2010, I was assigned to the F-Wing housing unit at DVI.  The F-Wing contains three tiers (or floors) of cells.  There are approximately 120 total cells in the F-Wing.  Each cell is generally occupied by two inmates.  Thus, there are approximately 240 inmates housed in F-Wing at any given time, with approximately 70 to 80 inmates housed on each tier.
>
> 3.  I worked the shift known as third watch (2:00 p.m. to 10:00 p.m.).  On May 26, 2010, during second watch (6:00 a.m. to 2:00 p.m.), the inmates housed in F-Wing's first tier and half of the second tier were permitted to shower.  One inmate housed in the first tier of that unit, Anthony Turner, was in the law library during the time when his tier was permitted to shower.
>
> 4.  At approximately 2:20 p.m. on May 26, 2010, I was in the F-Wing when there was an incident in the prison's H-Wing housing unit.  As a consequence, staff was summoned from the F-Wing to assist in responding to this incident and conducting searches.  This left only one officer on duty in the F-Wing.  Because only one staff person was on duty, inmates had to remain in their cells and did not have the opportunity to take showers.
>
> 5.  At approximately 7:50 p.m., the program in F-Wing returned to normal.  Inmates in the third tier were then permitted to shower.  Afterwards, inmates in the second tier who had not had the opportunity to shower earlier in the day were permitted to shower.  Due to the limited amount of time, and the large number of inmates to shower, the inmates on the first tier who had been in the law library when their tier had the opportunity to shower earlier in the day, did not get the opportunity to shower.
>
> 6.  Mail in the F-Wing was distributed to inmates prior to the evening meal (at approximately 3:00 to 4:00 p.m.) and again after the evening meal (at approximately 8 p.m.).  Inmate mail is distributed by officers in the housing unit.  When an officer has

14

mail for an inmate, he goes to that inmate's cell, asks to see the inmate's identification card, confirms that the mail is addressed to that particular inmate, and then hands that mail to that inmate. It was my custom and habit to follow this practice. I have no specific recollection of delivering mail to Turner. However, had Turner received mail, I would have acted consistent with my custom and habit and delivered him his mail pursuant to these practices.

7. On no occasion have I ever withheld legal mail that was addressed to Turner, then re-routed his mail, or prevented him from receiving his mail. Similarly, I have never prevented Turner from attending the prison's law library.

8. When an inmate in the F-Wing wishes to mail a letter, he may deposit that mail into a box by the officer's station in the housing unit. The box is kept locked and has a slot in it for inmates to slip through. That box is emptied by officers on the first watch (10:00 p.m. to 6:00 a.m.). Because I worked on the third watch in May 2010, I would not have been responsible for handling the inmate mail.

9. I never retaliated against Turner for filing his inmate appeals or lawsuits or other such activities.

(Dkt. No. 75-1 at 1-4.)

In his verified summary judgment motion, opposition to defendants' motion and supplemental opposition, plaintiff does not address the retaliation claims. The exhibits attached to these pleadings also do not contain evidence in support of plaintiff's retaliation claim. In the amended complaint, plaintiff generally alleges that defendant Hall denied him a shower, access to the law library and tampered with his mail in retaliation for his reputation as a "legal beagle." However, plaintiff offers no other specific allegations in support of this claim.

Defendants' unopposed evidence demonstrates that defendant Hall did not retaliate against plaintiff. In his declaration, defendant Hall states that plaintiff was denied a shower on May 26, 2010 due to what was, in essence, a scheduling conflict caused by an incident on H wing. In his declaration, defendant Hall describes the procedures by which inmates receive and send mail. In his declaration, defendant Hall states that he did not withhold plaintiff's mail or otherwise tamper with it. Defendant Hall also states that he has never prevented plaintiff from accessing the law library. Based on the statements in defendant Hall's declaration, the

1   undersigned finds that defendants have met their initial burden of demonstrating the absence of a

2   genuine issue of material fact as to plaintiff's retaliation claim.

3           Because plaintiff has failed to oppose defendants' summary judgment motion as it

4   pertains to defendant Hall, and no evidence in the record supports plaintiff's retaliation claim, the

5   undersigned recommends that defendant Hall be granted summary judgment.  Defendants also

6   argue that defendant Hall is entitled to qualified immunity.  Because plaintiff has not met his

7   burden of opposing defendant Hall's summary judgment motion, there is no need to address the

8   issue of qualified immunity as to the retaliation claims.

9           Defendants also move for summary judgment as to defendant Hall on grounds that

10  as a result of failing to respond to requests for admissions, plaintiff admitted that defendant Hall

11  did not violate his constitutional rights.  Defendants state that on February 9, 2011, they served

12  plaintiff with requests for admissions to which plaintiff did not respond.  (Dkt. No. 71-3 at 2.)

13  Request for admission one stated, "Hall did not violate your rights under the First Amendment."

14  (Id. at 4.)  Request for admission two stated, "Hall did not retaliate against you."  (Id. at 5.)

15  Request for admission three stated, "Hall did not violate any of your constitutional rights."  (Id.)

16  Request for admission six stated, "Hall did not reroute your mail."  (Id.)  Request for admission

17  seven stated, "Hall did not prevent your from receiving mail."  (Id.)  Request for admission eight

18  stated, "Hall did not deprive you of a shower."  (Id. at 6.)

19          Regarding requests for admissions, Federal Rule of Civil Procedure 36(a)(3)

20  provides that a matter is deemed admitted unless, within thirty days after being served, the party

21  to whom the request is directed serves an answer or objection.   On September 7, 2011, the

22  undersigned ordered plaintiff to show cause for his failure to respond to defendants' requests for

23  admissions.

24          In his supplemental opposition, plaintiff states that in November 2010, he was

25  transferred to Pelican Bay State Prison and placed in administrative segregation ("ad seg").  (Dkt.

26  No. 78 at 7.)   While in ad seg, plaintiff alleges that he had "restricted" access to his legal

1  property and that prison officials refused to give him his mail.  (Id.)  Plaintiff claims that his

2  legal property was confiscated on February 10, 2011. (Id. at 8.)  On that date, plaintiff was

3  placed on a bus and transferred to California State Prison-Corcoran ("Corcoran").  (Id.)

4  Following his arrival at Corcoran, plaintiff did not have access to his legal property until April

5  12, 2011. (Id.)

6        Plaintiff is apparently claiming that he did not respond to defendants' requests for

7  admissions because he was not aware of them because he was being denied access to his legal

8  property.  Plaintiff may also be claiming that he did not receive defendants' request for

9  admissions because of alleged tampering with his legal mail by prison officials.

10       Whether plaintiff was able to respond to defendants' requests for admissions is

11  not clear.  For this reason, the undersigned will not and need not consider plaintiff's failure to

12  respond to defendants' requests for admissions in resolving defendant Hall's motion for

13  summary judgment.

14       In his summary judgment motion addressing the claims against defendant Hall,

15  plaintiff argues that defendant Hall acted in a racially discriminatory manner when he denied

16  plaintiff a shower.  Plaintiff argues that "similarly situated" white and Hispanic inmates were

17  allowed to shower.  In the amended complaint, plaintiff generally alleged that defendant Hall was

18  "racially motivated" and targeted African Americans. (Dkt. No. 13 at 16.)   Plaintiff's amended

19  complaint contained no further allegations in support of this claim for racial discrimination.  For

20  this reason, the undersigned did not order service of these vague claims of racial discrimination.

21  See Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (noting that "[v]ague and

22  conclusory allegations of official participation in civil rights violations are not sufficient to

23  withstand a motion to dismiss").

24       Plaintiff's claim in his summary judgment motion that "similarly situated" white

25  and Hispanic inmates were allowed showers is not sufficient for the undersigned to revisit the

26  decision not to serve the racial discrimination claim.   Plaintiff does not explain how these white

1    and Hispanic inmates were "similarly situated."  Plaintiff also does not address defendant Hall's

2    statement in his declaration that plaintiff was not allowed to shower because plaintiff had been in

3    the law library when his tier had the opportunity to shower earlier that day.  Accordingly,

4    plaintiff's unsubstantiated allegations of racial discrimination will not be further addressed.

5              In their reply to plaintiff's opposition, defendants argue that they are entitled to

6    summary judgment because plaintiff failed to file a statement of undisputed facts as required by

7    Local Rule 260(b).  Local Rule 260(b) provides that a party opposing a summary judgment

8    motion "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those

9    facts that are undisputed and deny those that are disputed . . ."

10             It is true that plaintiff's opposition did not include a statement of undisputed facts.

11   However, as discussed above, defendants' reply contained new evidence, which is technically

12   improper.  Rather than striking the new evidence, the undersigned granted plaintiff an

13   opportunity to file a supplemental opposition.  Because defendants were granted some leeway in

14   their summary judgment pleadings, plaintiff will be as well.  Accordingly, the undersigned finds

15   that defendants are not entitled to summary judgment because plaintiff failed to include a

16   statement of undisputed facts in his opposition.

17             D.  Plaintiff's Request for Sanctions

18             In his opposition to defendants' summary judgment motion, plaintiff requests that

19   defendants be sanctioned for failing to comply with discovery orders and for failing to respond to

20   "summons deadlines."  Plaintiff contends that defendants failed to answer the complaint on time.

21   Defendants are not in default.  (See waiver of service filed February 7, 2011 (Dkt. No. 37).)

22             Plaintiff contends that defendants failed to respond to his discovery requests and

23   "lied" when they said they did.  It is unclear what particular discovery requests plaintiff is

24   claiming defendants failed to respond to.  Based on this record, the undersigned cannot find that

25   defendants acted in bad faith.  To the extent plaintiff is attempting to request additional time to

26   conduct discovery, the undersigned finds that such a request is not well supported.  See Fed. R.

Civ. P. 56(d) (if nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition to a summary judgment motion, the court may allow additional time for discovery).

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Plaintiff's motions for summary judgment (Dkt. Nos. 69, 70) be denied;

2.  Defendants' summary judgment motion (Dkt. NO. 71) be granted as to defendant Hall and denied as to defendant Colon.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   October 13, 2011

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

tur1848.sj